**Deborah MEYER–LIEDTKE,
Appellant,**

v.

**Norman LIEDTKE, Appellee.**

Superior Court of Pennsylvania.

Argued Sept. 12, 2000.

Filed Nov. 15, 2000.

---

Lynne Z. Gold-Bikin, Norristown, for appellant.

Susan P. Gantman, West Conshohocken, for appellee.

Before DEL SOLE, HUDOCK and STEVENS, JJ.

DEL SOLE, J.:

¶ 1 This is an appeal from a trial court order refusing Appellant (Mother's) request to relocate the parties' children to California to live with her and her new husband. We affirm.

¶ 2 Mother asserts the trial court erred when it failed to find that because Mother's life would be markedly improved by relocating to California, therefore the children's lives would also improve. She also claims that the court denied her the right to relocate in an effort to preserve Appellee (Father's) weekly visitation schedule. With regard to this second claim we find Mother mischaracterizes the reasons for the trial court's decision. We further conclude that the court did not err in its conclusion that it would be in the best interest of these children to refuse Mother's request to relocate them to California.

¶ 3 In reviewing the facts of this case we remain mindful that we are bound by the findings of the trial court which are supported by the record. *Thomas v. Thomas,* 739 A.2d 206, 209 (Pa.Super.1999). We are unable to substitute our judgment for that of the trial court and we may reject its conclusions only where they involve an error of law or are unreasonable in light of the sustainable findings of the court. *Id.*

¶ 4 The parties in this matter are the parents of two daughters, who at the time of the hearing were ages 13 and 8. In February of 1998, as part of the divorce proceedings, the parties agreed that Mother was to have primary physical custody of the two girls. Approximately one year after executing the agreement, Mother sought special relief and permission of the court to relocate with the children to live in California with her new husband, Mr. Harnett.

¶ 5 Mother, Father and the children lived together in the marital home until the parties separated in May of 1996. Mother and the children continued to live in the martial home and they were later joined by Mr. Harnett in December of 1997. In January, Mother and Mr. Harnett purchased a home in the Montgomery county area for 2 .2 million dollars and informed the children they would be moving there. One month later, they placed this house back on the market because they did not wish to do the needed renovations and they stayed in the marital residence. Three months later, in May of 1998, they took the new home off the market, renovations were begun and the children were advised they would be moving to this home and the marital residence would be sold. At the end of the school year, Mother insisted that the older daughter change schools and attend Episcopal Academy in the fall. In that effort she entered her daughter in its summer school program to learn French and the children moved with Mother into the new home. However, shortly before the start of school, Mr. Harnett moved back to the Boston area to attend to his business interests and Mother approached Father about a possible move with the children to Boston. She also suggested that the older child be home schooled, despite the fact that she had not done serious research on that option. Father's attorney prepared an emergency petition to have the child attend school and mother dropped the issue, but failed to inform Father that their daughter was attending her former school, Welsh Valley. About this same time Mother dismissed the woman who had been the children's nanny for nearly their

entire life. Father then promptly hired her. During the school year Mother and her husband thought about relocating to California and took the girls to see the area in advance of a possible move. In April of 1999, Mother and Mr. Harnett married. The next month, Mother and her husband signed a sales agreement on a large five bedroom home in Tiburon, California, near San Francisco, and placed the remodeled Montgomery County home on the market for nearly 4.4 million dollars. The children's belongings were moved to California in July of 1999, before the evidentiary hearing on the petition to relocate. The children attended summer camp in Pennsylvania in August of 1999 and then returned to live with a nearby relative in the Montgomery County area, pending resolution of the petition to relocate.

¶ 6 Mother testified at the hearing that she wished to relocate the children to California where her husband had opened a new business enterprise, so that she, her husband and the children can live together as a family unit. She testified that she found a home in a good school system in the countryside, close to a number of the children's activities, such as dance and piano lessons.

¶ 7 Mother's husband, Mr. Harnett, is the father of four grown children from two prior marriages. He was born in Ireland where he worked as a retailer. He later immigrated to the United States, moved to the Boston area and started a retail business, specializing in organic foods. The business grew and was profitable over the years. He sold this company in 1992 for approximately 75 million dollars. In 1993, he started his present company in a suburb of Boston. Mr. Harnett describes this company as an alternative pharmacy which sells herbs, vitamins, homeopathic medicines, ayurvedic medicines, Chinese patent medicines, body care, makeup, books and education. This company, "Harnett's," grew, prompting Mr. Harnett to have a development plan created in an effort to raise venture capital. As a result of that plan and his own study, Mr. Harnett determined that the dominant market for Harnett's was on the West Coast, particularly in California. In the fall of 1998, Mr. Harnett made a commitment to expand and move into the California market. He later invested $800,000 and opened a Harnett's store in Palo Alto, California. He further testified he would be unable to run this business while living in Pennsylvania because a retailer "is a hands-on business" and that "you need to be there." N.T. 7/27/99 at 194. Mr. Harnett indicated that when he tried to run the Boston operation by going there once or twice a month, sales slowed and the bottom line started slipping, which was "not a way to grow a company."

¶ 8 At the time of the parties' separation, Father moved out of the marital home to an apartment nearby. At the time of the hearing he was living in a home, near the old marital home, with his fiancée Ms. Lamb and her 5-year-old daughter. Father has visitation with the children every Wednesday evening, overnight, and every other weekend, Friday through Sunday. Father also drives both children to their respective schools three to four times a week. He also takes his younger daughter to breakfast two days a week after he drops the older daughter off at school. Father also coached his older daughter's basketball team for three years preceding the hearing and he has frequent contact with her as a result of this activity. N.T., 8/4/99, at 238. Father also makes daily telephone calls to the children prior to bedtime and enjoys periods of vacation time with them.

¶ 9 In an attempt to resolve the issue before it, the trial court applied the Superior Court's decision in *Gruber v. Gruber*, 400 Pa.Super. 174, 583 A.2d 434 (1990). Following *Gruber*, the court assessed the potential advantages of the proposed move and the likelihood that it would substantially improve the quality of life for Mother and the children, and was not the result of

a momentary whim on Mother's part. The court also sought to establish the integrity of the motives of both parents. Finally, the court considered the availability of realistic, substitute visitation arrangements to foster an ongoing relationship between the children and their father.

¶ 10 Mother claims that in applying these factors the trial court failed to recognize the underlying principles of *Gruber*. She asserts the court failed to consider that when a custodial parent's quality of life is substantially enhanced the children's best interest will be served and it is the happiness and stability of the primary custodial family which is foremost. Id. at 438. She also claims the court overlooked that under *Gruber* the custodial parent must be permitted to "go her own way", *id.* at 437–38, and that the move must not be disallowed simply because visitation cannot continue in the existing pattern. *Id.* at 440.

¶ 11 From our review of the record and the reasoning provided by the trial court for its decision, it is clear the court properly applied *Gruber* and its underlying principles while recognizing that it is the best interest of the children which is the ultimate guidepost for its decision. The court recognized that Mother would benefit if she relocated with the children to California because it would allow her to live full-time with her new husband while he pursues his newly-formed California business. However, the court also properly recognized that the personal happiness of the relocating parent cannot be the only or the predominant factor. The court wisely stated:

> It is beyond the belief of this court that any parent would petition to relocate their children if said relocation would not contribute to the personal happiness and emotional well-being of the petitioning parent. If these particular benefits to the relocating parent were to carry such weight alone, few relocations petitions would demand much attention and time by the court, few would be denied,

and the best interest of the children would take a back seat to the best interests of the relocating parent in virtually every case. Instead, this court is of the opinion that these factors are just some of the many that must be weighed by the court on the scales of the best interests of the children.

Trial Court Opinion at 18.

¶ 12 The trial court found the parties' motives were pure regarding their respective positions, with Mother wishing to live full-time with her husband and children near his new business in California and with Father concerned about the distance between him and the children. However, the court was concerned whether the proposed move was merely a momentary whim of Mother's. The court focused on the fact that during a relatively brief period of time the children have undergone a great deal of disruption in their lives. The court noted that Mr. Harnett came to live with Mother and the children about one year after Father left the marital home and that about one month later Mother and Mr. Harnett purchased a new home in the area. They then put this home on and off the market before moving in. At this same time Mother planned a change of schools for the older daughter and enrolled her in that school's summer program. Shortly before the start of school a move to Boston was planned with home schooling for this daughter. The home schooling plan and move to Boston was abandoned and this daughter was then sent to her former school. Mother and Mr. Harnett then explored a move to California, married, purchased a residence there and moved the children's possessions there, shortly before the girls attended summer camp and then returned to live, at least temporarily with Mother's relatives in Montgomery County pending resolution of the matter with the trial court. The court found "mother has not clearly focused on the best interests of the children when deciding where they will live." Trial Court Opinion at 16. The court noted that Moth-

er cares for her children and has their best interests at heart when making day-to-day decisions, however it concluded the proposed move to California is not in the children's best interests. The court found that it would greatly disrupt any stability and continuity the girls now have and add further transience in their living arrangements. The court noted that the children are attending excellent schools, have many friends and an active social life here.

¶ 13 The trial court was not convinced that a move of the family unit was necessary or that the new husband's business could not have been successfully established on the East Cost. The court found that although the $800,000 investment in the California venture evidenced a substantial commitment, it must be viewed in light of his substantial wealth. The court questioned whether it would be wiser for the Harnetts to maintain a household on each coast and travel between those residences. The court noted that the decision to pursue this new business venture was made by the adults and that the adults, Mother and Mr. Harnett, should bear any resulting sacrifices. It remarked that Mother and her husband can travel weekends without interfering with the well-being of the children and which would permit the children to have continuous contact with both parents and some stability in their life.

¶ 14 With respect to the third prong of the *Gruber* test the court found that due to the distance between the children's present home and the new location in California, there are no realistic, substitute arrangements which can adequately foster on ongoing relationship between Father and his daughters. The court noted that Father had enjoyed substantial, regular contact with his daughters. Because of the distance and travel time involved between California and Pennsylvania, the court stated it would be impractical and unfair for the children to travel back to Pennsylvania for even one weekend a month. Although Mother suggested that Father would be able to spend more time with the girls during longer school and summer breaks, the court found that this arrangement would prohibit the substantial contact that they have enjoyed with Father.

¶ 15 Upon review we find the trial court properly considered the *Gruber* factors. *Gruber* directs a court to consider the custodial parent's desire to exercise autonomy over decisions that affect his or her life, the children's interest in maintaining and developing a meaningful relationship with the non-custodial parent and, in turn, that parent's interest in sharing the love and rearing of the children. However ultimately the court is to consider "the state's interest in protecting the best interests of the children." *Gruber* at 438–39. The trial court clearly had such interests in mind when deciding this matter.

¶ 16 We recognize that often the children will benefit from moving with the custodial parent to a new home, in a new location, where that home environment offers that parent a substantial increase in the quality of life. However, we find the trial court correctly concluded that is not the case here. This is not a situation where the custodial parent is moving to have the support of family and friends nearby or to enjoy greater job opportunities, which can translate to better opportunities for the children or more time with the custodial parent at home. Here, Mother has a new marriage to a man who has embarked on a new business venture, yet untested, in a new market. While this new market may prove to be the most profitable area for this business to thrive, the trial court's conclusion that it is not the best location for the children to thrive is supported by the record. Accordingly, we find the trial court properly considered the children's best interest in denying Mother's request to relocate.

¶ 17 Order affirmed.